UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES, | ) | |
| | ) | |
| v. | ) | Docket No. 21-CR-10118-IT |
| | ) | |
| RAFAEL TORRES, | ) | |
| Defendant | ) | |
| | ) | |

**SENTENCING MEMORANDUM**

Rafael Torres respectfully submits this Sentencing Memorandum in support

of his request for a sentence of 120 months followed by five years of supervised

release.

**INTRODUCTION**

Rafael Torres was raised in Compton, California in the 80's and early 90's, an

environment plagued by readily visible gang-related violence and substance abuse.[1]

*PSR*, at ¶ 66. Mr. Torres recalls witnessing murders and seeing dead bodies as early

as elementary school, and he was regularly exposed to the effects of the crack

---

[1] *See e.g.* Robert Reinhold, *Gang Violence Shocks Los Angeles*, NY Times (Feb. 8, 1988), available at https://www.nytimes.com/1988/02/08/us/gang-violence-shocks-los-angeles.html; Shawn Hubler, *Homicides in 1992 Set Record for L.A. County: Violence: 2,589 killings in 1992 represent an 8% rise over previous year. Cultural changes and accessibility of guns cited as factors*, Los Angeles Times (Jan. 5, 1993), available at https://www.latimes.com/archives/la-xpm-1993-01-05-me-819-story.html; Elizabeth Hinton, *Los Angeles Had a Chance to Build a Better City After the Rodney King Violence in 1992. Here's Why it Failed*, TIME (May 18, 2021), available at https://time.com/6049185/los-angeles-rodney-king-misunderstand-what-happened/; Rich Connell, *The Hidden Devastation of Crack: The Epidemic is Eating Away Everyone's Quality of Life. Violent crime, Overtaxed Social Services and Drug-Addicted Babies are Having an Impact as Great as the Recession*, Los Angeles Times (Dec. 18, 1994), available at https://www.latimes.com/archives/la-xpm-1994-12-18-mn-10458-story.html; Daryl Kelley, *Violent Offenses Up 19% Despite Drop in Compton Crime Rate*, Los Angeles Times (Jan. 20, 1985), https://www.latimes.com/archives/la-xpm-1985-01-20-hl-10698-story.html#:~:text=Compton's%201984%20crime%20figures%20show,999%20to%201%2C098%2C%2010%25.

epidemic on his community. By middle school, many of his friends had joined gangs

who attempted to recruit Mr. Torres. Yet he consistently declined those advances.

His parents tried to limit his exposure to this environment by creating a

warm and supportive home. *PSR*, at ¶ 66. But by the time he was 14, his parents

decided to send him to live with his grandparents in Mexico, hoping it would be a

much safer environment for a young and easily influenced teenager. While the

neighborhoods may have been safer, the influences were no better, and Mr. Torres

views this time as more detrimental than helpful. Unbeknownst to his

grandparents or parents, older uncles and cousins people around exposed Mr.

Torres to drinking and drugs and encouraged him to join them in their vices.

Mr. Torres returned to California two years later, with a nascent addiction;

his usage soon escalated, and he gravitated toward negative influences. Moreover,

compared to the period of relative safety Mr. Torres enjoyed in Mexico, returning to

Compton brought a renewed sense of fear and anxiety. After spending two years

largely unconcerned about his physical safety, Mr. Torres was now thrust back into

daily precarity.

Against this backdrop, Mr. Torres's unhealthy habits solidified. He drank

heavily and began using cocaine daily. *PSR*, at ¶ 87. Because of this, he left high

school just before his senior year. As Mr. Torres became an adult, his drug of choice

progressed to methamphetamine. *PSR*, at ¶ 87 & *Objection # 13*. For the last

twenty years, Mr. Torres had used about an ounce of methamphetamine each week,

though sometimes he would use that much in just a few days. *Id*. On one occasion,

when Mr. Torres was a young adult, he suffered an accidental overdose. Mr. Torres looks back on this time and recognizes that his substance use disorder has impacted his life in profound ways. He became depressed, at times suicidal, and full of shame. He tried, sometimes successfully, to hide the impact and extent of his addiction from his family.

Yet neither his addiction, mental health struggles, nor the worst aspects of his upbringing eclipsed his kind and loving spirit. Those close to Mr. Torres speak highly of his character and his consistent desire to help others. His family and friends depended on him, and he would answer the call, offering aid whenever it was requested. Yet this was a heavy burden to shoulder; with everyone depending on him, he was ashamed to turn to others to ask for help when he was struggling to make ends meet with his mechanic business in early 2020, and during a phase where his substance use disorder began to deeply impact his ability to function.

It was his shame about asking for help, coupled with his desire to support those he loved, that ultimately led to his involvement in this case. He is not a major player in the drug business. Larios, one of the co-defendants in this case, is Mr. Torres's brother-in-law. Mr. Torres got involved in this offense with these transactions when his brother-in-law asked for his assistance. As foolish as it may have been to agree to do so, it was a choice motivated by a combination of his own fragility at the time (due to his substance use issues) and a sense of obligation, rather than pure ambition.

The one good thing about his arrest in this case was that it forced him to confront the fact that he needs help, in an environment where, in small ways at least, he could start to get that help. Significantly, he finally came to terms with having a substance abuse disorder, of which he was previously in total denial, and he has started the difficult work of addressing it. Similarly, this experience exposed his significant mental health challenges in a much starker relief than he had previously appreciated. While incarcerated for the instant offense, Mr. Torres received a depression diagnosis, and he started taking Prozac to manage his symptoms. Additionally, Mr. Torres has indicated a strong desire to pursue substance abuse treatment if it is made available to him. He is highly motivated to do the RDAP program, a program that will be particularly transformative for him since he has never been open to or received help for his substance use disorder before.

For Mr. Torres, incarceration has been difficult – particularly separation from his young son, his daughter, his wife, and his aging parents – but it has also been meaningful: it has allowed him to begin the process of healing and accepting responsibility for his decisions and committing to a positive, healthy, and productive future course. Mr. Torres takes his role in his community seriously and recognizes that his past decisions harmed those closest to him, as well as the community at large. However, with the support of his siblings, his parents, his wife and children, and many others in his community, Mr. Torres has the tools he needs to succeed. He is eager to continue to improve upon himself while serving his sentence, has

demonstrated an ability to do so through his productive conduct while in custody,

and he intends to continue that trajectory after his release.

<div align="center">ARGUMENT</div>

## I.  THE PROPOSED SENTENCE IS SUFFICIENT AND APPROPRIATE UNDER THE FACTORS IDENTIFIED IN 18 U.S.C § 3553(a)

The primary directive in 18 U.S.C. § 3553(a) is for sentencing courts to

impose a sentence sufficient, but not greater than necessary, to comply with the

goals set forth in § 3553(a).[2] Courts often arrive at the conclusion that criminal

conduct requires lengthy prison terms to effectively "punish" or "teach someone a

lesson." However, when more effective solutions are available – or when those

lessons are already being achieved by other means – prison is counterproductive for

both the offender and society.

In this case, a sentence of 120 months – which is more than 10 times longer

than the longest period Mr. Torres has ever served – is more than sufficient to

achieve the purposes of punishment. A longer sentence would ultimately be a

*subtractive* act, since it will only serve to further expose Mr. Torres to a

criminogenic environment without any added benefit, while preventing him from

continuing the difficult work of treatment for his addiction and mental health. It

---

[2] Those factors include:
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed--
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

also would be overly punitive, for in a system of graduated punishments, a sentence an order of magnitude greater than that which he has served before by its own terms ought to be more than sufficient to deter any future criminal behavior.

### A. Mr. Torres's history and characteristics support the requested sentence.

Despite his mental health and substance abuse challenges, Mr. Torres was always a loyal friend, reliable son and family member, and respected member of his community. Those close to Mr. Torres highlight his dependability, describing him as the friend you call if your car broke down at 3 in the morning, or who you turned to for support if you felt like no one else would understand.

This was a recurring theme in a recent long and emotional meeting between counsel and many (13) of Mr. Torres's family members. His sisters spoke of how he was their protective big brother, who was always there for them. *See also Alma Torres Letter*, attached as Exhibit A ("since he is the oldest of nine siblings, I feel like he has always felt the need to protect us, and he really has done so for as long as I can remember.")

But his family were not the only beneficiaries of his kindness. His sister Maria told a story of when Mr. Torres noticed a homeless man outside of a store they had just left. Even though the family was running late, Mr. Torres stopped and gave the man his socks and sweater, before going back into the store to buy him food. His mother tells a similar story in her letter to the Court:

> As a mom I remember one time I sent him to the grocery store to buy a few items that I needed to complete our meal and as he was walking in, he encountered a man who was in need. He had no food and he told him he was hungry, well my son being the good hearted person that he is he

gave the man all the money that I had gave him to buy the groceries we needed and he came home to tell me that he couldn't buy the items because he had gave that man all the money that I had gave him.

*Maria Torres and Rafael Torres, Sr. Letter*, attached as Exhibit B.

His sister Patrisia tells of how Rafael used to buy an old neighbor's groceries for her, and would help landscape her yard, because she could not move well. He did the same for another elderly couple, also giving them rides to appointments.

Mr. Torres's compassion is a through-line in support letters submitted by friends and family. An old friend describes Mr. Torres as "the type of person that will take off the shirt on his back to give to you if needed." *Christian Hernandez Letter*, attached as Exhibit C. His sister Patricia also highlights this reputation: "[a]nyone who has crossed Rafael's path can speak highly of him and his genuine heart and [he] is always ready to lend a hand to anyone in need even if you are not family." *See Patricia Torres Letter*, attached as Exhibit D.

Even while Mr. Torres was experiencing immense personal internal struggle, he was there for his community. *See e.g. Alma Torres Letter*, attached as Exhibit A (Mr. Torres is "[s]omeone you can always count on to be there when you need him, and not just for his family but also for his friends and the community. … He has been someone that me and my children have aways felt supported by. I can remember myself always needing a ride to take my children to their doctor's appointments and my brother was always there to help."); *Maria Hernandez Letter*, attached as Exhibit E ("Rafael was always available to help out, anytime anybody needed help, all they had to do was 'call junior' as we all know him as. Always ready to lend a hand at any time."); *Antonia Montoya Letter*, attached as Exhibit F ("A

7

person I know I can always count on and no matter what time I call I know my good friend is always there for me."); *Maria Torres Letter*, attached as Exhibit G ("Of all my siblings I can honestly say that Rafael is the one with the kindest heart, always looking out for all his siblings as well as for my parents. Not only for the family but also for others and helping them out in any way possible regardless of if the person was family or a simple stranger."); *Mayra Hernandez Letter*, attached as Exhibit H ("I remember one time I had a flat tire, and he came to the rescue even though it was late at night he got out of bed and came to help. Rafael has a heart of gold and is always there when you need him. … He is a good provider to his family and always takes care of all his loved ones."); *Sergio Rivera Letter*, attached as Exhibit I ("This man is the brother to 6 sisters, and 2 brothers that ultimately depend on him for mostly everything of mechanics, to fixing their homes house appliances, being there for them when they feel alone, to helping them get to work and back if they have no ride, and even being there for them when sick and in times of need.").

Mr. Torres is just as reliable and compassionate with his wife and children. He and his wife, Ophelia, have been together since 1998 and have enjoyed a loving, supportive relationship. While the couple have sometimes had periods of distance largely due to Mr. Torres's drug use and poor decisions in the periods of time when he was actively using, they maintain a strong overriding devotion to each other. They are of very limited means, and live a simple life in a challenging, and at times, unsafe, neighborhood. Together, they have two children: a 23-year-old daughter, and an 11-year-old son. Mr. Torres was, at all times and by all accounts, an involved

and caring father to his children. Prior to his arrest on the instant matter, he would take his son to school regularly. He would take his daughter to and from work on a regular basis. He spent substantial time with his children, whether it was gaming, riding scooters, teaching his son how to fish,[3] or going on weekend trips together. With his parents' support, his son has excelled in math, and he often competes in math competitions.

Mr. Torres's actions and his current incarceration have made his family life difficult: both of his children become quite emotional when speaking about his involvement in the instant case. His son has had a particularly difficult time with Mr. Torres's absence; family members have expressed a concern that the bright vivacious young man is suffering from depression in his father's absence. As a general matter, depriving a young child of a parent has profound negative impacts. One study suggests that, for children in "early adolescence," defined as between 11 and 14 like Mr. Torres's son, effects of separation can include a "[r]ejection of limits on behavior," and "[t]rauma-reactive behaviors."[4]

Mr. Torres speaks with his wife and children nearly every day, and he describes his relationship with each of them positively. His wife continues to be a supportive partner as best she can, and Mr. Torres is eager to reunite with her and forge a healthy path forward as a family. *See e.g. PSR*, at ¶ 77.

---

[3] *See e.g. Antonia Montoya Letter.*

[4] *See* Jeremy Travis, Elizabeth McBride, and Amy Solomon, *Families Left Behind: The Hidden Costs of Incarceration and Reentry* (June 2005), available athttps://www.urban.org/sites/default/files/publication/50461/310882-Families-Left-Behind.PDF.

In pursuit of that goal, Mr. Torres worked tirelessly while incarcerated to take accountability and establish a foundation for success upon release. He has completed 12 different programs at Wyatt. To date, he has completed the following programming: 1. Criminal Lifestyles, 2. Living with Others, 3. Adjustment to Incarceration, 4. Anxiety Self-Help Guide, 5. Manage Stress, 6. Mental Health Awareness, 7. Anger Management for Substance Use, 8. What is Right for Me, 9. Relaxation Techniques, 10. Coping Skills, 11. Assertive Skills, 12. Cognitive Processing Therapy. *See Certificates from Wyatt*, attached as Exhibit J.

Mr. Torres has also chosen to take additional online courses on his tablet, and has completed over thirty of these courses, including A Student Guide to Drug and Alcohol Abuse and Advanced Interpersonal Communication. *PSR*, at ¶ 90. *See also Online Wyatt Certificates*, attached as Exhibit K. Mr. Torres also participated in a volunteer program to freshen up the space at Wyatt by painting the walls, detailing the railings, and reducing clutter. *See Letter from Major Kristen Damaso*, attached as Exhibit L. According to Major Damaso, all inmates were offered to participate in this program, but "[s]ome detainees refused to help, some detainees complained about the inconvenience but some detainees stepped up and helped the staff assist in the details." *Id*. Mr. Torres was one of those who volunteered his time, and he was an active and engaged participant. Major Damaso opined that he was an "integral part of the success of the detail." *Id*.

Mr. Torres also earned the privilege of working in the kitchen at Wyatt. He briefly lost this job as a result of a disciplinary ticket for possessing alcohol that was

manufactured by another inmate for Mr. Torres's birthday. *PSR*, at ¶ 83, 85.  He

lost this job for roughly two-and-a-half months but, again demonstrating his strong

work ethic, went back to work as soon as allowed to do so, and now works in the

Pod, cleaning and buffing the floors.

Mr. Torres also has a steady work history. He is skilled with his hands, and

had been working as a mechanic prior to his arrest. *PSR*, at ¶ 95. He is a talented

mechanic, relied upon by his family, friends, and many in his community. *Id*. He

had previously worked in construction, and he has either worked in construction or

mechanics for much of his life. *Id*. His strong family connections, and demonstrated

ability to work hard, positions him better than most for chances of success on

release, particularly as he finally gets a handle on his substance use disorder.

Hoping to keep these skills fresh so that he may pursue similar employment

after his release, Mr. Torres has taken courses at Wyatt such as Construction

Safety & Hazards and Electrical Safety. *Exhibit K*. Additionally, Mr. Torres recently

signed up for a GED Course at Wyatt. He plans to complete his education after

being interrupted for so long by his substance use disorder, and he hopes that this

will open doors to more opportunities for him after his release.

It is hard to overstate the significance of his recognition of his substance use

disorder. Concededly, it came belatedly, but it is nevertheless a profound course

correction. He started using cocaine when he was 15 years old. He used cocaine

almost daily for many years. *See e.g. PSR*, at ¶ 87. He also started drinking alcohol

when he was 15, but largely stopped drinking in his 30s when he began to use

methamphetamine more regularly. *PSR*, at ¶ 85. He mostly lived in denial about
the true scope of his substance use disorder and the damage it has caused in his life
and the lives of others until his arrest in this case. Spending time sober and in
custody, in a place that actually offered him some intervention, has granted Mr.
Torres a newfound perspective into all facets of his life. He can confront the wasted
opportunities, the physical damage to himself, and the damage he has caused to
others.

## B. The requested sentence advances the other objectives embodied within 18 U.S.C. § 3553(a)(2).

The 18 U.S.C. § 3553(a)(2) factors seek to advance the four goals that are
typically attributed to sentencing: retribution, rehabilitation, deterrence, and
incapacitation. See *United States v. Tapia*, 564 U.S. 319 (2011) ("In determining the
appropriate sentence, judges must consider retribution, deterrence, incapacitation,
and rehabilitation, §3553(a)(2), but a particular purpose may apply differently, or
not at all, depending on the kind of sentence under consideration).

Retribution refers to just deserts. What is just and the usefulness of the
"deserts" is unclear. While retribution may have its place, it should not be elevated
above other considerations, and to the detriment of the other three objectives.
"Retribution sits uncomfortably at the intersection of two aspects of our responses to
harm: our desire for people to suffer and our desire for people to change [....] But
there is another option [....] the issue is not just how we show our condemnation,
but how we affirm unequivocally and powerfully the importance of what was

violated, without destroying the person who violated it."[5] In other words, the most

powerful form of retribution is one which demands that the offender commit himself

to repairing the harm done. An extended prison sentence will do little to advance

this repair.

The requested sentence does, however, sufficiently advance the goals of

deterrence and rehabilitation. While system actors – courts, prosecutors, and even

defense attorneys – continue to operate as if deterrence can be achieved through

longer carceral sentences, researchers have concluded that long prison sentences

afford little, if any, deterrent value.[6] For instance, a 2013 meta-analysis of studies

on deterrence overwhelmingly concluded that "it is clear that lengthy prison

sentences cannot be justified on a deterrence-based, crime-prevention basis."[7]

Rather, leading deterrence scholars for the past two centuries have

overwhelmingly found that both specific and general deterrence is primarily a

function of the *certainty of apprehension*, not the severity of the punishment.[8]

Increasing prison term's length reduces recidivism by a negligible amount, if at all.[9]

---

[5]Sered, Danielle, Until We Reckon, Violence Mass Incarceration and the Road to Repair. New York: The New Press, at 89-90.

[6] *See* Martha Nelson et al., *A New Paradigm for Sentencing in the United* States, VERA INST. OF JUST. 23 (Feb. 2023), available at https://www.vera.org/downloads/publications/Vera-Sentencing-Report-2023.pdf; Marc Mauer, *Long-Term Sentences: Time to Reconsider the Scale of Punishment*, 87 UMKC L. Rev. 113, 121,123-124 (2018); NAT'L INST. OF JUST., *Five Things About Deterrence* 1-2 (May 2016), available at https://www.ojp.gov/pdffiles1/nij/247350.pdf; *Long Prison Terms*, JUST. POL'Y INST., https://justicepolicy.org/long-prison-terms/ (last visited Feb. 9, 2023).

[7] *Id*. at 23, citing Daniel S. Nagin, *Deterrence in the Twenty-First Century*, *in* 42 CRIME & JUST. 199, 202 (Michael Tonry, ed., 2013).

[8] *See* Nelson et al., *supra*, at 23; Daniel Nagin, *Incarceration & Public Safety*, ARNOLD VENTURES 4-5 (July 2022), available at https://craftmediabucket.s3.amazonaws.com/uploads/AVCJIReport_IncarcarationPublicSafety_Nagin_v2.pdf; Maurice J.G. Bun et al., *Crime, Deterrence and Punishment Revisited*, 59 Empirical Econ. 2303, 2329 (2019).

[9] *See* William Rhodes et al., *Relationship Between Prison Length of Stay and Recidivism: A Study*

The *prosecution and arrest* of Mr. Torres itself had substantial general deterrent value. Requiring him to serve a sentence greater than 120 months in prison will yield little, if any, productive general or specific deterrent effect. On the contrary, it may have a deleterious impact on specific deterrence concerns and would expend unnecessary tax-payer resources. *See PSR*, at ¶112.

In further considering the issue of specific deterrence, Mr. Torres does not pose a cognizable risk of danger to the community or of recidivism. Mr. Torres's record is not particularly lengthy or serious.[10] His most recent case prior to the instant case was from 2016. Most of his prior criminal history dates back to the early 2000's when Mr. Torres was a much younger man, who was feeling the impact of growing up in a dangerous neighborhood. Mr. Torres' longest sentence was 2 years – on the 2016 case – for which he only served 11 months. A sentence of ten years would be 5 times longer than the longest sentence he has previously received, and more than ten times longer than the longest amount of time he has ever actually served. In a system of graduated punishments, this is more than sufficient to adequately punish Mr. Torres and deter any future criminal conduct.

---

*Using Regression Discontinuity and Instrumental Variables with Multiple Break Points*, 17 Criminology & Pub. Pol'y 731, 733, 758 (2018); *Long Prison Terms, supra.*
*See also* Susan Howley, *Reflections on Long Prison Sentences: Conversations with Crime Survivors, Formerly Incarcerated People, and Family Members*, COUNCIL ON CRIM. JUST.: TASK FORCE ON LONG SENTENCES 6 (Jan. 2023), available at https://assets.foleon.com/eu-west-2/uploads-7e3kk3/41697/reflections_on_long_prison_sentences_-_howley.4d54a984fb61.pdf.

[10] Mr. Torres acknowledges that the existence of prior firearms-related cases may be concerning. However, as noted above, Mr. Torres grew up in Compton, a place riddled with gang violence and drugs. His possession of firearms was exclusively for potential protection of himself and his family due to the dangerous neighborhood he lived in. Notably, there is no gun-related violence on Mr. Torres's record.

Further, Mr. Torres had a limited involvement in the instant conspiracy, as reflected by the minor role reduction. *See PSR*, at ¶ 40. The involvement that he did have was motivated by his familial relationship with Larios, who was the only person involved in the conspiracy that Mr. Torres knew.

The fact that Mr. Torres lacks any allegiance to the DTO, and instead has a clear desire to separate himself from his reckless decisions, became apparent as soon as he was arrested. When he was arrested, he immediately took responsibility for his actions. He admitted to interviewing agents that he had picked up the $65,000. He informed the agents that he brought those funds to a hotel and that someone came and picked it up. He did not deny his conduct in an environment when many others would have.

Further, Mr. Torres did not enjoy authority at any level of the conspiracy. He did not direct other's behavior. On the contrary, his behavior was directed by others. His role was that of a money courier: to pick up money and to deliver it. The reason he was trusted with this task was not because of his role in the organization, but rather because Mr. Larios regarded him as family.

Mr. Torres was not transporting drugs. He was not directing others to make sales on his behalf. Indeed, he was screened out of actual significant drug transactions and even discussions surrounding those transactions. His role was limited, and efforts were taken by the DTO to ensure that he did not exceed that limited role.

Given the factors which led to his involvement in this conspiracy, and his

limited role therein, there is little chance that Mr. Torres will reoffend. This is

particularly true when considering that Mr. Torres has finally begun receiving long-

needed substance abuse and mental health treatment. Thus, a sentence greater

than 120 months will have no additional deterrent effect. Indeed, under the

proposed disposition, after serving 10 years, Mr. Torres will be on supervised

release for an additional 5 years, which is more than sufficient to ensure that he

remains on track in his sobriety.

C.    **A sentence of 120 months would avoid unwarranted sentencing disparities.**

A sentence of 120 months is in line with what similarly situated defendants

have received. According to data from the Judiciary Sentencing Information, there

were 18 other defendants whose guideline was § 2D1.1 with a Final Offense Level of

31 and CHC IV between fiscal year 2018 and fiscal year end 2022, after removing

those who provided substantial assistance. *PSR*, at ¶119. Of those 18 defendants,

the average sentence was 131 months. *Id*. When individuals who provided

substantial assistance were included, there were 24 defendants. *PSR*, at p. 23,

Chart One. 42% of those 24 defendants received downward departures from the

guidelines range. *Id*.

Here, if Mr. Torres were an average defendant, the JSIN data would perhaps

suggest that a sentence of 131 months is justified, whereas this Court's own prior

sentencing would also support a downward departure. Yet the facts and

circumstances of this particular case as discussed above separate Mr. Torres from

the average defendant, warranting an 11-month downward departure from the average, to 120 months. Specifically, Mr. Torres's history and characteristics as well as his minimal role in the conspiracy support a downward departure. This is particularly true when considering the fact that the most time Mr. Torres has ever spent in custody is eleven months, and the proposed disposition is more than 10 times longer. Further, Mr. Torres's risk of reoffending is minimal where his involvement in this case was limited, and where he has finally acknowledged and begun to address both his addiction and mental health generally.

Lastly, Mr. Torres has demonstrated a desire to rehabilitate himself in ways much greater than the average, as evidenced by the remarkable amount of programming he has completed while in custody and his volunteering to help detail the prison when so many others outright refused. As if that wasn't enough, in his letter to this Court Mr. Torres describes witnessing the profound positive impacts on other inmates who had completed the Restorative Justice ("RJ") program and wishing that he himself had been able to complete the program. *See Rafael Torres Letter*, attached as *Exhibit M*. [11]Instead, those who had completed RJ formed their own group called "Building on Self Substance." This group meets 1-2 times per week, with reading and writing assignments as well as group therapy style sessions. Mr. Torres quickly joined this group and has reported "a burning desire for

---

[11] In his typical straightforward style, Mr. Torres made sure to point out to counsel that this letter was written not only by himself but was written collaboratively with other men involved in his informal restorative justice group.

more of this type of program." *Id*. He describes having "been positively impacted by the things I am learning and, in turn, want to impact others." *Id*.

<div align="center">

**CONCLUSION**

</div>

A ten-year sentence is an appropriate and substantial punishment that is more than sufficient to deter any future criminal behavior. It accounts for Mr. Torres's minimal role in this conspiracy – handling money at the request of a family member, rather than as a leader, distributor, or decision maker. Yet it does not undervalue the severity of the overall crime; it is a meaningful sanction in light of Mr. Torres's previously limited experience with incarceration. At ten times the length of Mr. Torres's longest custodial term, it represents a substantial ratcheting upwards and sends an unmistakable message to Mr. Torres and the community that drug trafficking will not be tolerated, but not so draconian as to strip Mr. Torres of the incentive to continue with the improvements on which he has embarked since his arrest, or to risk divesting him of the compassion and dependability that his friends and family have long admired.

<div style="margin-left: 45%;">

Respectfully Submitted,
**RAFAEL TORRES**
By his attorney:

/s/ Jessica D. Hedges
Jessica D. Hedges
BBO No. 645847
Hedges & Tumposky, LLP
88 Broad St, Suite 101
Boston, MA 02110
T (617) 722-8220

</div>

## CERTIFICATE OF SERVICE

I, Jessica D. Hedges, hereby certify that on this 14th day of October 2023, I served one true and correct copy of this motion, through the electronic filing system, on all counsel of record in this matter.

/s/ Jessica Hedges
Jessica D. Hedges